Good morning, Your Honors. James Andre Bowles appearing for Mr. Rincon-Perez. Your Honors, the first thing I would point out is a case that we added to supplement our briefs, and that is a case called Webb v. Sloan, which just coincidentally, very coincidentally, was a case that developed in Carson City, 30 miles away from this particular case. The fact pattern in Webb v. Sloan and this particular case are very similar. We have a very obvious different result in that case as it stands today because that case went to trial and Mr. Webb recovered a rather significant award. I bring that up because in this case, this case has been the defense in this case, the appellee, has attempted to make this appear to be a case which involved an arrest for a relatively short period of time. This is not a case about a bad arrest. This is a case. Who has the duty here? Is it the police or is it the prosecutor? They both have a duty, Your Honor, but in this particular case, it's brought against the police, and the police had the duty because they had the evidence, Your Honor, and they concealed that evidence. They misrepresented what had occurred. They misrepresented the facts in the case, and they were sitting on evidence that would have exculpated Mr. Rincon-Perez the very hour of his arrest. Well, I thought Webb v. Sloan suggested the duty ultimately is on the prosecutor, not the police. Is that wrong about that? What Webb v. Sloan did not put it upon the prosecutor. What Webb v. Sloan held was that if a prosecutor prosecutes a case on its own decision, despite the police telling them that it is a bad arrest and there is no merit, there is still municipal liability. So if you apply Webb v. Sloan's finding as far as liability, you come to the same conclusion. And that is even if you can blame it on this, in this case, on the prosecutor, it doesn't relieve Sparks of their duty or their liability. So in this case, the difference is, is even though Sparks would still have liability based on the fact that the prosecutor brought this case knowing that they had the wrong man, in this case, the police knew they had the wrong man, and they brought the case despite the knowledge, the fact, hard evidence that said the real culprit was Francisco Paco Garcia. They knew it. Well. Your theory was that they should have knew. Well, Your Honor, my theory is how could they not have known when they had to? What is the evidence that they did? I thought the issue was that they obviously pretty grossly failed to follow up, but it's not as if they had the knowledge, at least the evidence. Is there evidence that shows that they actually did the follow up and found out that there was the other person that ultimately got tagged with this? There was. There was a follow up, Your Honor. The only follow up that they really did was they called in the pager. Now, it's their position and we believe it's our position that that's a gross misrepresentation that the pager they called the young lady who had the pager according to them. And we have no way to confirm or deny what she told to them. But in fact, she told our investigator who had that pager, his name was Paco, and he had lost it. Now, the inference obviously is that she wouldn't lie to the police and then tell us the truth. In fact, that is our position, that the facts, when this case is tried, will show that they knew that that pager could be linked directly to Paco. The key, Your Honor, has a number on it. It has instructions on it. Merely picking up that phone and calling car-to-band company, they would have found out that that key was registered to a Francisco Garcia. They didn't do any of that. Now, we don't know if they did that or not. Now, is this just a gross misconduct or error on the part of the police? Our position, Your Honor, that this is not just somebody who was too lazy to do his job, Your Honor. There had to be a conscious decision to decide that they wanted to try this case against this person with the very, very sketchy evidence that they finally took to trial. Our position is that this was a conscious decision, and even during the trial, when it was pointed out to them... Well, no, wait a minute. I'm sympathetic to your client's situation, but I'm trying to sort out who you're trying to tag with this. The cops don't decide to take something to trial. That's the prosecutor's decision. The cops make the arrest, and then whether they had evidence or not at that point that exonerated your client is one issue. Whether they should have done something with it to serve their function of getting at the proper person. But the DA at that point steps in as the prosecutor and makes the decision whether or not to take something to trial. The cops don't do that, do they? Well, Your Honor, in this particular case, the DA makes the decision based on what the cops give him. Well, it may be, but the prosecutor decides whether or not he thinks under whatever his standards are that it's a triable case, and then the cops can't control that. They can withhold evidence, and they can be guilty of dereliction of duty and all of that. So what's the constitutional obligation on them? What are they supposed to be doing here that you say they shouldn't do that's within their power? Well, the police, when they have something that they recognize, and they have to recognize this, Your Honor, that this particular key is the key to the case. They have to know that. I mean, I can't say that I can't look inside that officer's mind and say that he knew that, but I can tell this Court that this is such an obvious key to solving the case that it's not mere negligence or even gross negligence. It's not even reckless. It requires a conscious decision to have this critical piece of evidence and totally ignore it because you know you have somebody in custody that is, in this particular case, an innocent man, but you know you have him in custody with a very suspect identification. The identification is something that all officers know. It's taught in Basic 101 in law enforcement. You know an identification is at best questionable. So they went into it with that. And there's evidence here that the officers were, had a mindset from the very beginning because their mindset is demonstrated by the fact that one of the officers, and it's ratified by Lieutenant Lee, that, well, this kid was wearing long sweatpants that had wear pattern on the bottom. And it was very obvious during the trial that the wear pattern wasn't just that a wear pattern. It was not from a bicycle sprocket. You see, throughout this case as it develops, the police repeatedly buttress their case by either misrepresenting what the evidence is or, in the case of the key and the pager, actually it's more than a misrepresentation. They had to know this. I would like to save my time. I do, Your Honor. Thank you. Good morning, Your Honors. Stan Brown, Jr. on behalf of Appellees with me is Chester H. Adams, the city attorney for the city of Sparks. In order to review Judge McKibben's decision in this case and determine whether summary judgment was proper, this court need only look at its prior precedent, which governs this case, which Judge McKibben correctly applied, and that was United States v. Bagley, United States v. Kieffler, and United States v. Hammond. And those cases focus on what the officers knew at the time they made the arrest, what were the totality of the circumstances. In this case, the undisputed material facts are these. The victim, Connie Jo Mickey, woke up in her home. She saw a male intruder standing above her. The male intruder left through the daughter's window, proceeded out into the street, and jumped on a motocross bicycle. Assuming that we agree that all of the circumstances leading up to the arrest of Mr. Rincon Perez would satisfy the requirements of probable cause. Okay. What is the city's position, then, as to the responsibility when, in the course of that helter-skelter first activity, they get enough to put somebody in jail? I'm sorry. Let me finish the question. They also, in the course of that, acquire what is said to be here, and would seem to be the case given the result, an obvious and important and exculpatory piece of evidence that they simply ignore. First of all, I don't think there's any evidence in the record at all that suggests that these officers ignored the pager or the keys at all. What did they do with them? If you will look at Officer Clayton's report, and it is in the excerpt of the record at page 260, he said the pager and the set of keys, which, by the way, were found at the crime scene back at Connie Jo Mickey's home after the arrest had been committed. I'm saying they got you to the arrest. I'm talking about post-arrest. All right. The pager and the set of keys did not belong to anyone in the household, and were taken as evidence, and were entered into evidence. I checked with Pagemart, and the only information that they would give me was that a Madeline Valencia owned the pager, and it is unknown as to what her contact or her knowledge of the suspect is. It is felt possibly that the suspect either removed his pager from another vehicle, or had the use of his girlfriend's pager, if that is a possibility. I was unable to contact Madeline Valencia at this time, but will follow up this evening when I come to work. Which you didn't do. Which I believe, at that point, the case was cleared on arrest, and the case was thereafter referred to the district attorney's office. So the poor guy is in jail for 42 days because the left hand gives it off to the right hand and says, we're done with our side of it, and what is the DA going to say? He relies on the cops to do their job? What the testimony was, was that after the standard procedure is that the case is cleared on arrest, and I guess I- Arrest, you mean the detectives have not assigned over for further investigation? Unless they are asked by the deputy district attorney to do some further investigation, and the record will reflect it in one particular instance. Deputy District Attorney Roger Holmes did ask for the set of keys as well, but he was doing that at the direction of the district attorney's office. Now, mind you, we're not unsympathetic with this young man's plight, and the fact that he spent 43 days in jail. The fact remains that our legal responsibility was terminated upon the clearing of this case on arrest, and sending it to the district attorney's office, and that's what Judge McKibben properly found. Was there a- Judge Hawkins, can you hear me? Oh, excuse me. Go ahead, Judge Hawkins. Yes, I have a question. Does Nevada law require a detention hearing within 48 hours of arrest? I'm sorry, I didn't hear you. Does Nevada law require a detention hearing within 48 hours of arrest? That's a good question. I'm not a criminal lawyer, so I'm sorry I can't answer that. I thought there was some hearing, and the judge- wasn't this one where the judge had a- Maybe I'm thinking of another- Yeah, yeah, yeah. Oh, there was a preliminary hearing, but it wasn't held until October 6th. The date of the arrest in this case was August 28th, 1996. So far as the city is aware, this person never had a hearing for the entire 42 days? As far as we know. Judge Hawkins, did you have a question? My follow-up to that was, if there is a requirement for a detention hearing within 48 hours of arrest, why wasn't that done here? Well, and that's a very good question, but that wouldn't have been the responsibility of the Sparks Police Officers to have arranged for that hearing. As far as I know, that would have been the responsibility of the Washoe County District Attorney's Office at that time, and or Court Appointing Counsel for Mr. Perez. We were only there to investigate the crime prior to the arrest upon the clearing of our office by that arrest. Quite frankly, I think they had the wrong parties before the court in this particular case, as Judge McKibben pointed out. Spill it out. Quite frankly, I think that the plaintiff did not have all the proper party defendants in this case. In other words, he should have joined whom? He should have joined Washoe County, as Judge McKibben rightly pointed out. If you have no further questions of me, that's all I have. There will be nothing further from the city? Very good. Mr. Bowles, help us on this 48-hour issue and whether there was any kind of hearing. Statute requires a reading of charges within 72 hours, Your Honor. That's all. It's not a hearing. Did that happen here? It did, Your Honor. It's just merely they're brought in front of a camera and they're told what they're charged with. This case is about probable cause, Your Honor, and probable cause is defined in several cases as a totality of circumstances. In this case, a totality of circumstances have to include all the evidence. They can't just wait a minute. You've got to break it down. There's probable cause to arrest. Okay. Then there's the follow-on, probable cause to detain, perhaps. But keys that were found at the original site, you're not contending, are you, that the arrest itself, or are you, that the arrest itself should not have been made on the eyewitness ID because they found these keys? I absolutely do say that, Your Honor. They had a right under Nevada law to hold him for up to one hour because they had witnesses. He got out of bed, Your Honor. He came from the bedroom next to his mother. His mother said he's been here all night. He was going to work in two hours. The kid had no prior anything. And they had a totality of circumstances here that clearly pointed out that they had the wrong guy. And they ignored everything except the ID. And the ID, if it was all there was, they could have gone to trial. They could have done anything they wanted. But they had this other evidence. And the evidence was so glaringly simple. And they had a duty to look at that evidence. You can't blame it on the DA who is immune. Follow that up. So you're saying that they could have put him on a hold for an hour? Under Nevada statute. But it took your investigators six hours to track it down during daytime. So what would have been, what would have, on the ground reality, what would they have done? Assuming that they found these keys, they've got eyewitness ID and all of that. What would they have done? The holding him for an hour, even under your own scenario, wouldn't have cleared anything. They would have come up, you know, with maybe some leads, but not cleared him. The one phone call on the key would take less than an hour, Your Honor. But the other thing is they had the keys that they matched to nothing. Those keys didn't match anything of his. The pager didn't match him. His mother said he was home in bed. I mean, so they've got one very questionable piece of identification. So the evidence, thank you, Your Honor. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn. All rise. Please be seated. If you'd like to make a call, please hang up and try again. If you need help, hang up and then dial your operator. If you'd like to make a call, please hang up and try again. If you need help, hang up and then dial your operator. If you need help, hang up and then dial your operator. If you need help, hang up and then dial your operator. I represent the city of Kentucky. The city didn't care. I represent the city of Kentucky. I'm aware of the call. I'm aware of the call. I'm aware of the call. I'm aware of the call. I represent the city of Kentucky.  I'm aware of the call. I'm aware of the call.   I'm aware of the call. I'm aware of the call. I'm aware of the call. Yeah. Oh yeah. Yeah, we have another one. Thank you.
judges: O'scannlain, Hawkins, Fisher